**UNITED STATES of America**

v.

**Ransom F. SHOUP, II, Appellant.**

**No. 79–1391.**

United States Court of Appeals, Third Circuit.

Argued Sept. 6, 1979.

Decided Oct. 26, 1979.

Stephen R. Bolden (argued), Fell, Spalding, Goff & Rubin, Kirk T. Karaszkiewicz, Broderick & Karaszkiewicz, Philadelphia, Pa., for appellant.

Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, App. Div., Philadelphia, Pa., Robert L. Herbst, Asst. U. S. Atty., Deputy Chief, Sp. Prosecutions Div., Chicago, Ill., William E. Ball (argued), Asst. U. S. Atty., Philadelphia, Pa., for appellee.

Before ADAMS, HUNTER and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Ransom F. Shoup II was convicted by a federal jury on one count of conspiring with Edward Goldsmith[1] to defraud the United States and to obstruct justice, 18 U.S.C. § 371 (1976), and on one count of willfully attempting to obstruct justice, 18 U.S.C. § 1503 (1976). The district court sentenced Shoup to three years probation on each count, to be served concurrently, and also imposed a $5,000 fine on each count. Shoup filed a timely appeal.

### I.

This case arises out of a federal investigation of possible voting fraud in the November 7, 1978 Philadelphia general election. Considerable controversy and public interest accompanied the election, largely because of a proposal on the ballot that would have amended the Philadelphia

1. Goldsmith was indicted along with Shoup and pleaded guilty prior to Shoup's trial.

Home Rule Charter to permit the mayor to remain in office for more than two terms. The election was marred by widespread malfunctioning of voting machines, the breakdowns occurring primarily in wards where sentiment was running against the proposed charter change. Immediately after the election, the United States Attorney for the Eastern District of Pennsylvania and a federal grand jury began to investigate whether there had been deliberate attempts to tamper with the voting machines, and thereby to deprive citizens of their constitutionally protected right to vote. The next day, the United States Attorney hired Shoup, the owner of a voting machine manufacturing and repair company, to aid in the investigation. Shoup, in turn, employed eleven experts to assist him. Edward S. G. Dennis, the Assistant United States Attorney in charge of the investigation, instructed Shoup to inspect the machines in question and to prepare a written report containing his findings and conclusions.

Shoup had completed and typed a draft of his report by November 20, 1978. On November 21, he took a copy to Goldsmith, a former chairman of the Camden County Board of Elections. Goldsmith testified that, at their meeting, Shoup explained the nature of the report and told him that "Commissioner Marge" was under investigation. "Commissioner Marge" is Margaret M. Tartaglione, chairwoman of the Philadelphia City Commissioners. The City Commissioners are responsible for overseeing elections in Philadelphia, monitoring the polling places, and purchasing and repairing voting machines.

According to Goldsmith, Shoup asked him whether he knew Tartaglione and whether he would take a copy of the report to her so that she could review it and recommend changes to Shoup. Shoup then asked Goldsmith if he thought Shoup could obtain Philadelphia voting machine business by permitting Tartaglione to review and change

the tone of the report; Goldsmith replied that he thought Shoup could obtain such business.[2]

Goldsmith agreed to arrange a meeting between Tartaglione and Shoup, and thereafter delivered a copy of the report to Tartaglione. Goldsmith told Tartaglione to review the report and to advise Shoup if she had any changes. He told Tartaglione that Shoup would make any additions or deletions that she requested, and added that Shoup would be very good to her.[3] On November 27, Tartaglione's lawyer notified the United States Attorney of Goldsmith's actions. With Tartaglione's consent, the F.B.I. attached a recording device to her telephone. On November 29, Tartaglione called Goldsmith to ask whether Shoup had submitted the report to the United States Attorney. Goldsmith called Shoup who stated that he had not yet submitted the report, but was going to do so that afternoon. Goldsmith then informed Tartaglione of this, and Tartaglione quickly set up a luncheon meeting with Shoup for that day.

Prior to her meeting with Shoup, and again with her consent, the government equipped Tartaglione with a recording device. At the meeting, Shoup told Tartaglione that he had not yet submitted his report. When Tartaglione replied that there were portions that could hurt her, Shoup offered to reword the report "to soften it up some."[4] The two then agreed to several language changes. Tartaglione asked Shoup why he had given her a copy of the report; Shoup replied that Goldsmith was close to Mayor Errichetti of Camden, and that Goldsmith and Errichetti wanted Tartaglione to see it. Shoup explained:

Well, I, I think what their feeling is that you're close with Rizzo therefore and the mayor over there is close with Rizzo therefore if there was anything that could be detrimental, they would rather it

---

2. Goldsmith Direct Testimony, App. 414–16.

3. Tartaglione Direct Testimony, App. 475.

4. Transcript of Shoup-Tartaglione Luncheon Meeting, App. 1328–30.

be stricken before it got released, I guess.[5]

At the close of their meeting, Shoup told Tartaglione: "So what I'd like is, you know, I never saw you and I'd rather that just disappear as far as the copy is concerned."[6]

Two days after the luncheon meeting with Tartaglione, Shoup submitted his final report to the United States Attorney. Three sections were changed as follows:

(1) *Draft Report* page 1: "A *complete* lack of maintenance was evident on all machines."

*Final Report* page 1: "A lack of maintenance was evident on all machines."

(2) *Draft Report* page 2: "Excessive delay in the response of the mechanics to the polling place in answer to a service call (*as long as six hours*)."

*Final Report* page 2: "Excessive delay in the response of the mechanics to the polling place in answer to a service call."

(3) *Draft Report* page 2: "The mechanics which answered the service calls could not properly diagnose the problem. A back-up mechanic would then be called; however, as many as four back-up mechanics had to be called before the problem could be resolved. *It is obvious that mechanics were not qualified to resolve the service calls. A qualified mechanic should have corrected most of the problems within a few minutes after his arrival.*"

*Final Report* page 2: "The mechanics which answered the service calls, *in some cases*, could not properly diagnose the problem. A back-up mechanic would then be called; however, as many as four back-up mechanics had to be called before the problem could be solved."

(4) *Draft Report* page 2: "A *complete* lack of maintenance was evident on all voting machines."

*Final Report* page 2: "A lack of maintenance was evident on all voting machines."[7]

Shoup never informed the United States Attorney of his meetings with Goldsmith or Tartaglione. The government claims that, in light of Shoup's conduct, it was forced to hire another voting machine expert to complete its investigation.

Shoup raises a number of contentions on appeal: (1) The evidence adduced at trial was insufficient to establish a conspiracy to defraud the United States. (2) There was insufficient evidence to prove an obstruction of justice or a conspiracy to obstruct justice. (3) It was legally impossible for Shoup to commit the offenses of which he was convicted. (4) In its charge to the jury, the district court failed to define correctly the elements of a conspiracy to defraud the United States. (5) The district court erred in its entrapment instruction, because the charge might have caused the jurors to believe that Shoup's defense was based exclusively on entrapment. (6) It was error for the district court to permit the prosecution to introduce testimony by an assistant United States Attorney that the government was forced to hire a new voting machine expert as evidence that the government was harmed by Shoup's actions.

■ When, on appellate review, there is a charge that the evidence is insufficient to support a verdict, the verdict "must be sustained if there is substantial evidence, taking the view most favorably to the government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). After considering Shoup's contentions under this standard, as well as assessing his charges that the district court committed various legal errors, we affirm.

### II.

■ In considering a conspiracy under § 371, a court must be mindful that the statute is a broad one, and that there is a danger that prosecutors may use it arbitrarily to punish activity not properly within

---

**5.** *Id.* at 1365.

**6.** *Id.* at 1429.

**7.** App. 1363–64, 1368–69 (emphasis added to highlight deleted words).

the ambit of the federal criminal sanction.[8] Thus, indictments brought under § 371 must be carefully scrutinized. *Dennis v. United States*, 384 U.S. 855, 861, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). With this admonition in mind, we approach Shoup's first contention—namely, that there was no proof of a conspiracy because there was inadequate evidence of an agreement to defraud the United States.

■ To establish a conspiracy under § 371, the prosecution must prove three elements: (1) the existence of an agreement, (2) an overt act by one of the conspirators in furtherance of the objectives, and (3) an intent on the part of the conspirators to agree, as well as to defraud the United States.[9]

In *United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), the Supreme Court declared that "the law of conspiracy identifies the agreement to engage in a criminal venture as an event of sufficient threat to social order to permit the imposition of criminal sanctions for the agreement alone, plus an overt act in pursuit of it, regardless of whether the crime agreed upon is actually committed." [10]

The indictment here alleged that Shoup and Goldsmith conspired to defraud the United States by agreeing to deprive the government of the benefits to which it was entitled under the contract between Shoup and the United States Attorney, and by agreeing to alter Shoup's report.[11] Shoup claims that the evidence was insufficient, as a matter of law, to support these charges.

It is undisputed that Shoup and Goldsmith entered into an agreement. Goldsmith acceded to Shoup's request that he deliver the report to Tartaglione and arrange a meeting between Shoup and the Commissioner. The critical question then is whether they entered into the agreement with the intent to defraud the United States.

Shoup argues that Goldsmith could not have intended to defraud the government because Goldsmith was to receive no compensation in exchange for his actions pursuant to their agreement. In *United States v. Salcido-Medina*, 483 F.2d 162 (9th Cir.), *cert. denied*, 414 U.S. 1070, 94 S.Ct. 582, 38 L.Ed.2d 476 (1973), the Court of Appeals for the Ninth Circuit rejected a similar argument. There, the defendant contended that the district court erred in refusing to instruct the jury that it could not convict him

8. *See generally* Goldstein, *Conspiracy to Defraud the United States*, 68 Yale L.J. 405 (1959).

9. "In a conspiracy, two different types of intent are generally required—the basic intent to agree, which is necessary to establish the existence of the conspiracy, and the more traditional intent to effectuate the object of the conspiracy." *United States v. United States Gypsum Co.*, 438 U.S. 422, 443 n. 20, 98 S.Ct. 2864, 2876, 57 L.Ed.2d 854 (1978) (citing W. LaFave & A. Scott, Criminal Law § 61, at 464–65 (1972) ). *See United States v. Falcone*, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L.Ed. 128 (1940).

10. 420 U.S. at 694, 95 S.Ct. at 1268. *See United States v. Bayer*, 331 U.S. 532, 542, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947); *Pinkerton v. United States*, 328 U.S. 640, 644, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). *See also Krulewitch v. United States*, 336 U.S. 440, 447 n. 4, 69 S.Ct. 716, 93 L.Ed. 790 (Jackson, J., concurring) (defining conspiracy as "concert in criminal purposes"). The crime of conspiracy dates back to the enactment of three statutes during the reign of Edward I. These statutes were intended to correct historical abuses of the criminal proc-

ess and thus proscribed combinations to procure false indictments, to bring false appeals, and to maintain vexatious lawsuits. Under the statutes, however, the conspiracy was not complete unless the person falsely accused was actually indicted and acquitted. In 1611, the Court of Star Chamber expanded the statutory doctrine of conspiracy and established the rule that a completed conspiracy does not require that the objectives of the agreement be attained. In *Poulterers' Case*, 77 Eng.Rep. 813 (1611), a group of poulterers had confederated falsely to accuse Stone of robbery. The grand jury refused to indict him, however. In Stone's subsequent suit for damages against the poulterers, the Star Chamber held that the failure to indict was no defense. The confederation itself constituted the conspiracy; success of the common plan was unnecessary.

For a lucid study of the subsequent development of the law of conspiracy, see Sayre, *Criminal Conspiracy*, 35 Harv.L.Rev. 393 (1922).

11. The portions of the indictment charging conspiracy to obstruct justice and obstruction of justice will be discussed in part III *infra*.

of conspiracy unless it found that "[e]ach defendant . . . in some sense promote[d] their venture himself, [made] it his own, [had] a stake in the outcome." *Id.* at 164. The court of appeals held that the trial judge had not erred, and noted that "[w]e have been cited to no case which states that the language [about a stake in the venture] is essential to a proper instruction on conspiracy." [12] *Id.* at 165.

■ There would be little justification for placing on the prosecution the burden of proving that each conspirator expected to benefit from the conspiracy. The agreement itself, along with other evidence of criminal or fraudulent purposes, demonstrates that the parties to it (1) manifested a disposition to criminal activity and (2) posed an enhanced danger to the community by their concerted, mutually enforcing actions.[13] Therefore, the element of compensation is not necessary to guard against the danger that the innocent will become ensnared in the net of a conspiracy prosecution. Although an anticipated benefit may be evidence of an alleged coconspirator's mens rea, we agree with the Ninth Circuit that benefit, or a "stake in the venture," is not an element of § 371.

■ Shoup also claims that the prosecution failed to prove that Goldsmith intended to defraud the United States because the government did not produce any evidence of an agreement that Goldsmith would advise Tartaglione that Shoup would "soften" the report in exchange for repair business. Shoup apparently argues from this that he and Goldsmith could not conspire within the meaning of § 371 because Goldsmith lacked the necessary mens rea.

Admittedly, there is no specific evidence in the record of an explicit agreement that Goldsmith would convey Shoup's offer to change his report to favor Tartaglione in exchange for repair business. There is, however, substantial circumstantial evidence to support the jury's conclusion that Goldsmith and Shoup did enter into an agreement with the intent to defraud the United States.

It is well-settled that intent to commit the substantive offense underlying an agreement may be inferred from the actions of the alleged coconspirators. In *Direct Sales Co. v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943), the Supreme Court affirmed the conviction of a corporation for conspiracy to violate a federal narcotics act. The Court held that the

---

**12.** The court of appeals observed that Judge Learned Hand, in *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir.), *aff'd*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), suggested that "a stake" in the venture was an element of conspiracy, but also noted that the Supreme Court, in affirming the Second Circuit, *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), did not mention Judge Hand's language in its definition of conspiracy. 483 F.2d at 164–65. Moreover, in *Direct Sales Co. v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943), the Supreme Court indicated that a conspirator's stake in the venture is evidence of the conspiracy, but is not an element of the crime. The Court stated: "And there is also a 'stake in the venture' which, even if it may not be essential, is not irrelevant to the question of conspiracy." *Id.* at 713, 63 S.Ct. at 1270. *See also* W. LaFave & A. Scott, *supra* note 9, § 61, at 460–61 (citations omitted):

One might suppose that the agreement necessary for conspiracy is essentially like the agreement or "meeting of the minds" which is critical to a contract, but this is not the

case. Although there continues to exist some uncertainty as to the precise meaning of the word in the context of conspiracy, it is clear that the definition in this setting is somewhat more lax than elsewhere.

**13.** *See Iannelli v. United States*, 420 U.S. 770, 778, 95 S.Ct. 1284, 1290, 43 L.Ed.2d 616 (1975) (quoting *Callanan v. United States*, 364 U.S. 587, 593, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961)), in which the Supreme Court stated: "This Court repeatedly has recognized that a conspiracy poses distinct dangers quite apart from those of the substantive offense. '. . . Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish.'" *See also* Model Penal Code § 5.03 Comment at 97 (Tent. Draft No. 10, 1960); W. LaFave & A. Scott, *supra* note 9, § 61, at 459–60.

jury reasonably could have inferred an illegal intent on the part of the corporation to join and to promote the objectives of an existing conspiracy from evidence that the corporation, a mail-order wholesale drug company, sold unusually large quantities of morphine sulphate to a physician over an extended period of time. The covert nature of conspiracy, the Court emphasized, requires that the proof "be circumstantial and therefore inferential to an extent varying with the conditions under which the crime may be committed." *Id.* at 714, 63 S.Ct. at 1271 (citation omitted). It concluded, "there is no legal obstacle to finding that the supplier not only knows and acquiesces, but joins both mind and hand . . . to make its accomplishment possible. The step from knowledge to intent and agreement may be taken." *Id.* at 713, 63 S.Ct. at 1270.

Shoup concedes that he asked Goldsmith, at the time of their discussion, whether Goldsmith believed that Shoup could obtain repair business by meeting with Tartaglione. Goldsmith responded that he thought Shoup could obtain such business, and thereafter told Tartaglione that Shoup would be very good to her in changing the language of the draft report. We conclude that Goldsmith's knowledge of Shoup's motives and intention to alter the language of the report that he was to submit to the United States Attorney constitutes circumstantial evidence of the kind from which a jury reasonably could infer that Goldsmith agreed with Shoup to defraud the United States.

Shoup relies on *United States v. Tarnopol*, 561 F.2d 466 (3d Cir. 1977), to support his claim that the evidence in the record was insufficient to establish that he intended to defraud the government. In *Tarnopol*, the Court reversed the defendant's convictions for conspiracy to defraud the United States by impeding the lawful functions of the Internal Revenue Service. The evidence established that the defendants, a group of record company executives, failed to enter on their own books a number of sales transactions. The prosecution contended that the omissions constituted fraud against the defendants' competitors and established a conspiracy to file fraudulent tax returns, thereby defrauding the United States under § 371. There was no evidence, however, that the defendants in fact filed inaccurate tax returns. The Court held that the evidence of the defendants' failure to record the sales on their own books was an insufficient predicate from which a jury reasonably could infer that the defendants intended to defraud the United States. *Id.* at 474–75. To support such an inference, the evidence must show at least that the alleged conspirators acted in a manner manifesting an intent to defraud the government.[14]

Here, there is an abundance of evidence from which the jury reasonably could have inferred that Shoup agreed with Goldsmith for the purpose of defrauding the United States. Shoup admits that he asked Goldsmith to take the report to Tartaglione with the hope that she would reciprocate by securing for Shoup Philadelphia's voting machine repair business. At their luncheon meeting, Shoup told Tartaglione that he would reword the report "to soften it up some" in order not to cast Tartaglione in a bad light. Later, Shoup made the changes Tartaglione requested. He also told Tartaglione that Goldsmith and Mayor Erichetti of Camden wanted her to see the report so that she could excise anything that might be detrimental to the Mayor of Philadelphia. And, at the conclusion of the meeting, Shoup told Tartaglione to destroy her copy of the draft report and not to mention to anyone that they had met. In contrast to the evidence in *Tarnopol*, the foregoing shows that Shoup acted in a manner from which the jury reasonably could infer that his purpose was to defraud the United States. Shoup's own words, spoken in an unguarded manner, manifest his motive to compromise his supposedly impartial inquiry in order to solicit business for his

14. *See United States v. Aviles*, 274 F.2d 179, 189 (2d Cir.), *cert. denied*, 362 U.S. 974, 80 S.Ct. 1057, 1058, 1059, 4 L.Ed.2d 1009, 1010 (1960).

personal gain. His entire course of conduct—his pursuit of Tartaglione, his offer to change the report, his explanation of his behavior, and especially his furtiveness—is circumstantial evidence of a guilty mind. Accordingly, we hold that the finding by the jury regarding Shoup's mens rea, implicit in its verdict, is supported by substantial evidence.

■ Shoup also complains that the prosecution's failure to prove that the changes in the report were misrepresentations or concealments requires a reversal on this count. He argues that the final report was accurate and therefore the government was neither misled nor injured by the changes. This contention might have merit had Shoup been charged with fraud, rather than conspiracy to defraud. Section 371 does not require that the government actually be harmed; it reaches " 'any conspiracy for the *purpose* of impairing, obstructing or defeating the lawful function of any department of Government.' " *Dennis v. United States*, 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966) (quoting *Haas v. Henkel*, 216 U.S. 462, 479, 30 S.Ct. 249, 54 L.Ed. 569 (1910)) (emphasis added).

The Court of Appeals for the Second Circuit rejected a similar argument in *United States v. Manton*, 107 F.2d 834 (2d Cir. 1939), in which the defendant, a judge, was convicted of conspiracy to obstruct justice and to defraud the United States by allegedly accepting bribes from parties with cases before his court. Manton protested that his conviction was improper because the prosecution had not proved that his decisions in the challenged cases in fact were incorrect. The court of appeals, speaking through Mr. Justice Sutherland as Circuit Justice, held that, even if Manton had not altered his voting behavior, he could be convicted of a conspiracy to defraud because he had entered into the bribery agreement for the purpose of defrauding the government. The conspiracy was complete, said Justice Sutherland, upon the formation of the bribery agreement and the execution of one act in furtherance of that agreement. *Id.* at 845–46.

■ Although Shoup may have submitted a technically accurate report, the jury nonetheless reasonably could have concluded that he intended to defraud the United States. He offered to "soften" his report upon Tartaglione's request, and in fact made all of the changes she suggested. Shoup modified the tone, if not the meaning, of his original language in order to cast Tartaglione in as favorable a light as possible and thereby to mislead the government in its investigation. The United States Attorney had bargained for an impartial evaluation, and Shoup colored his findings to further his personal goals. Thus, regardless of the "technical accuracy" of his final report, the evidence supports the conclusion that Shoup conspired for the purpose of impairing a lawful function of government. *See Dennis v. United States*, 384 U.S. at 861, 86 S.Ct. 1840.

We therefore hold that there is substantial evidence in the record from which the jury reasonably could have found that Shoup conspired to defraud the United States in violation of § 371.

### III.

The second challenge Shoup raises is that his actions did not amount to an obstruction of justice or a conspiracy to obstruct justice under § 371 or § 1503. Section 1503 imposes criminal sanctions on anyone who "corruptly . . . influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede the due administration of justice." Courts have interpreted this section as applying only to interference with a pending *judicial* proceeding.[15]

■ Although not raised on appeal, there is arguably some question whether the indictment charged a conspiracy to obstruct justice. Count one alleged that Shoup and Goldsmith conspired to obstruct

---

15. *Pettibone v. United States*, 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419 (1893); *United States v. Simmons*, 591 F.2d 206 (3d Cir. 1979); *United States v. Walasek*, 527 F.2d 676 (3d Cir. 1976); *United States v. Ryan*, 455 F.2d 728 (9th Cir. 1972).

justice in violation of § 1503 by "impairing, obstructing and impeding the lawful functions of the United States Department of Justice."[16] It did not specifically charge, however, that they conspired for the purpose of impeding the investigation conducted by the grand jury. The question then is whether the failure of the indictment specifically to connect the alleged act of conspiring to impede the United States Attorney to the stated crime of conspiracy to obstruct justice denied Shoup his Fifth Amendment right to be indicted by a grand jury[17] or his Sixth Amendment right to receive adequate notice of the crimes with which he was charged.[18] Because the failure of an indictment to charge a federal offense would be a jurisdictional defect, we must consider this question even though Shoup has not raised it. *United States v. Clark*, 412 F.2d 885, 887–88 (5th Cir. 1969); *Chappell v. United States*, 270 F.2d 274, 276 (9th Cir. 1959). When the defendant has not raised this issue, however, the indictment should be upheld if "the necessary facts appear in any form, or by fair construction can be found within the terms of the indictment."[19]

■ The right of a defendant in a federal felony case to be indicted by a grand jury is designed to protect "citizens against vindictive prosecutions, either by the government or by political partisans, or by private enemies."[20] This is accomplished by limiting a person's "jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge."[21] The function of the grand jury then is to determine whether there is probable cause that the defendant has committed acts that constitute an offense against the United States. It is not the grand jury's role to decide questions of law.

■ We conclude that the failure of the indictment to allege specifically that Shoup conspired to impede a federal judicial investigation did not deny him his Fifth Amendment right to be indicted by a grand jury for this specific charge. The indicting grand jury found probable cause to believe that Shoup impeded the investigation conducted by the United States Attorney. The investigations by the United States Attorney and the grand jury into alleged voting fraud were conducted jointly. Our conclusion that, under these circumstances, obstruction of the United States Attorney's inquiry is equivalent to an impairment of the federal grand jury's investigation[22] is a legal determination. Consequently, the interpretation of the indictment as sufficiently alleging that Shoup obstructed justice would not usurp the indicting grand jury's function of determining probable cause.

■ Shoup also has been adequately informed of the nature of the charges against him as required by the Sixth Amendment. The indictment charged obstruction of justice, cited specifically to § 1503, and alleged that Shoup impeded the investigation conducted by the United States Attorney. Shoup was thereby apprised both of the acts on which the grand jury based its charge and that the prosecution had to

---

16. App. 167.

17. Amendment V to the Constitution provides: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ."

18. Amendment VI to the Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."

19. *Hagner v. United States*, 285 U.S. 427, 433, 52 S.Ct. 417, 420, 76 L.Ed. 861 (1932) (failure to challenge indictment prior to verdict). *See United States v. Pheaster*, 544 F.2d 353, 361

(9th Cir. 1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977) ("indictments which are tardily challenged are liberally construed in favor of validity"); *Kaneshiro v. United States*, 445 F.2d 1266, 1269 (9th Cir.), *cert. denied*, 404 U.S. 992, 92 S.Ct. 537, 30 L.Ed.2d 543 (1971).

20. 1 J. Story, Commentaries on the Constitution of the United States § 1779, at 658 (1833).

21. *Stirone v. United States*, 361 U.S. 212, 218, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960).

22. See pp. 962–963 *infra*.

prove that he conspired to obstruct the operations of a judicial body. Therefore, despite the less-than-perfect draftsmanship, the indictment gave Shoup sufficient notice of the nature of the charges to enable him to defend against them.[23]

Having concluded that the indictment did charge a conspiracy to obstruct justice under § 1503, we turn to the challenges that Shoup raises regarding the sufficiency of the evidence to support his conviction under this statute.

Shoup insists that the evidence failed to demonstrate that he interfered with the grand jury's investigation. He asserts that, at most, his conduct was directed at the inquiry by the United States Attorney, but did not amount to a conspiracy or an endeavor to obstruct a judicial proceeding. As we have previously declared, the issue is "at what point does an investigation by law enforcement officers cross the threshold to become a pending grand jury investigation" for purposes of § 1503.[24]

**23.** The Court of Appeals for the Ninth Circuit addressed a similar challenge to the sufficiency of an indictment in *Kaneshiro v. United States*, 445 F.2d 1266 (9th Cir.), *cert. denied*, 404 U.S. 992, 92 S.Ct. 537, 30 L.Ed.2d 543 (1971). The indictment there charged the defendants with violating 15 U.S.C. § 902(a) which makes it illegal "for any manufacturer or dealer . . . to transport, ship, or receive any firearm or ammunition in interstate or foreign commerce." The indictment did not allege, however, that defendants were manufacturers or dealers. The court held that, while the indictment was "obviously an example of poor draftsmanship," it sufficiently apprised the defendants of the charges against them because "it contained express allegations charging violations of the statute." 445 F.2d at 1269. Thus, the defendants were notified that the prosecution had to prove that they were manufacturers or dealers; and, the defendants were sufficiently apprised of the facts on which the prosecution planned to rely.

This Court has also previously grappled with the problem of the sufficiency of an indictment. In *United States v. Schoenhut*, 576 F.2d 1010 (3d Cir.), *cert. denied*, 439 U.S. 964, 99 S.Ct. 450, 58 L.Ed.2d 421 (1978), a former mortgage officer of a federally insured bank was convicted on several counts of an indictment charging him with breaching his statutory duties to the bank and to the public. Count one alleged that the defendant violated 18 U.S.C. § 215 (1976) by procuring a loan from Central Penn National Bank to Karlee Corp. through Delaware Valley Mortgage and Realty Corp. in exchange for a fee. At trial, the evidence showed that loan was from Central Penn to Delaware Valley for the use and benefit of Karlee and Greenmeadow Holding Co., 576 F.2d at 1021–22. The Court rejected the defendant's contention that this was an unconstitutional variance because "the indictment accurately charged *all* of the facts which were proven at trial, though proven in a different manner than that alleged." *Id.* at 1022 (emphasis in original). The *Schoenhut* panel distinguished other cases in which we reversed convictions that were based on evidence of acts different from those alleged in the indictment. Cf. *United States v. Crocker*, 568

F.2d 1049, 1058–60 (3d Cir. 1977) (conviction reversed because of testimony that defendant committed illegal acts not charged in the indictment); *United States v. Goldstein*, 502 F.2d 526, 527–31 (3d Cir. 1974) (en banc) (conviction reversed because indictment charged failure to file income tax returns by April 15, while evidence showed extension until May 7 and failure to file by latter date). Unlike *Crocker* and *Goldstein*, the indictment in this case set forth all of the acts on which Shoup's conviction was predicated and informed him that the prosecution had to prove that he interfered with a pending judicial proceeding.

For the same reason, this case is distinguishable from *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the benchmark case in this area. In *Stirone*, the Supreme Court reversed the defendant's conviction on the ground that the evidence presented at trial varied so substantially from the *acts* alleged in the indictment that the defendant in effect was convicted of a crime with which he was not charged. The indictment had alleged that the defendant unlawfully interfered with interstate commerce by *importing sand* into Pennsylvania, while the evidence showed both importation of sand *and* exportation of steel. The Court declared that it was impossible to conclude "with certainty that with a new basis for conviction added, Stirone was convicted solely on the charge made in the indictment the grand jury returned." *Id.* at 217, 80 S.Ct. at 273.

The indictment here correctly alleged the acts on which the prosecution would predicate its case—namely, that Shoup impeded the investigation of the United States Attorney. Neither the grand jury that indicted him nor the petit jury that convicted him were concerned whether the United States Attorney's investigation was tantamount to a judicial proceeding. This is a question of law. Thus, unlike the Court in *Stirone*, we can be assured that Shoup was indicted and convicted on the basis of the acts alleged in the indictment.

**24.** *United States v. Simmons*, 591 F.2d 206, 208 (3d Cir. 1979).

In *United States v. Walasek*, 527 F.2d 676 (3d Cir. 1976), the Court was confronted with a similar challenge to the applicability of § 1503. There, the defendant was convicted of obstructing justice by destroying records that had been subpoenaed by a federal grand jury. The defendant claimed that the grand jury proceedings were not pending within the meaning of § 1503 because the grand jury had not yet called any witnesses. We stated that the proper approach to this kind of question is "not to establish a rule, easily circumvented, by which some formal act of the grand jury will be required to establish 'pendency.' The remedy is rather to continue to inquire, in each case, whether the subpoena is issued in furtherance of an actual grand jury investigation . . . ." *Id.* at 678. Whatever limits might be placed on § 1503, we held that deliberate destruction of documents under subpoena by a sitting grand jury fell within the terms of the statute.

Three years later, in *United States v. Simmons*, 591 F.2d 206 (3d Cir. 1979), the Court was required to decide the question whether § 1503 proscribed the destruction of documents that were subpoenaed by application of an Assistant United States Attorney on behalf of a regularly sitting federal grand jury, even though the latter did not know of the subpoena. In concluding that grand jury proceedings were pending, we held that requiring grand jury cognizance of the subpoena would frustrate the purposes of § 1503. The statute "allows punishment of actions taken with the specific intent to impede the administration of justice." *Id.* at 209 (footnote omitted).

Shoup argues that he could not have obstructed justice within the meaning of § 1503 because his report was requested by the United States Attorney, not by the grand jury. The grand jury and the United States Attorney simultaneously began their investigations of possible voting fraud on November 8, 1978, the day after the election. That same day, the grand jury issued subpoenas for records and testimony, including one directed to Tartaglione. On November 9, the United States Attorney hired Shoup to investigate the voting machines. Two days later, Dennis, the Assistant United States Attorney in charge of the investigation, told Shoup that he was considering making Shoup's report public through a grand jury report.[25] Dennis also advised Shoup that he was scheduled to testify before the grand jury in about two weeks.[26] On November 21, Shoup and Goldsmith agreed to forward a copy of the draft report to Tartaglione, and on November 29, Shoup and Tartaglione had their meeting.

The evidence demonstrates that the investigations by the United States Attorney and by the grand jury were conducted jointly. Shoup knew that his report would likely be submitted to the grand jury and that he would be called to testify about his findings. Shoup's actions, the testimony establishes, were taken during a pending judicial investigation and, had he accomplished his goals, they would have affected the grand jury's inquiry into the alleged voting fraud. Accordingly, we hold that, to the extent Shoup endeavored to impede the investigation conducted by the United States Attorney, he obstructed justice within the purview of § 1503.

We are also persuaded that there was substantial evidence to support the jury's finding that Shoup endeavored to obstruct justice and conspired to obstruct justice under § 371 and § 1503. Although Shoup's report was never submitted to the grand jury, and therefore did not in fact impede its investigation, successful obstruction of justice is not an element of either § 371 or § 1503. As developed in part II, a conspiracy is complete upon the formation of the agreement and the execution of any act in furtherance of the agreement.[27] Similarly, one may *endeavor* to obstruct justice without actually succeeding in that endeavor. In *Osborn v. United States*, 385

25. Dennis Direct Testimony, App. 585.

26. *Id.* at 589.

27. *See* notes 10 & 13 *supra*.

U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), the Supreme Court affirmed an attorney's conviction under § 1503 for instructing a police officer to bribe a prospective juror in a federal criminal trial. The Court held that the word endeavor " 'describes any effort or essay to accomplish the evil purpose that the statute was enacted to prevent. . . . The section . . . is not directed at success in corrupting a juror but at the "endeavor" to do so.' " *Id.* at 333, 87 S.Ct. at 435 (quoting *United States v. Russell*, 255 U.S. 138, 143, 41 S.Ct. 260, 65 L.Ed. 553 (1921)). Shoup's statements to Goldsmith about obtaining repair business from Tartaglione, his willingness to alter his supposedly impartial evaluation in order to curry Tartaglione's favor, and his statement to Tartaglione that the Mayor of Camden wanted the Mayor of Philadelphia to have the opportunity to strike anything unfavorable in his report together demonstrate a pattern of activity designed to thwart the government's investigation of the City Commissioners' role in the alleged voting fraud. Therefore, we hold that the evidence supports the jury's conclusion that Shoup conspired with Goldsmith for the purpose of impeding the grand jury's investigation, and that Shoup endeavored to obstruct justice within the meaning of § 1503.

### IV.

Inasmuch as we have carefully reviewed the other contentions raised by Shoup and find them to be without merit, we shall address these claims more briefly than we have the first two.

■ Shoup contends that it was legally impossible for him to violate § 371 and § 1503 because (1) he did not conceal anything from the United States Attorney, and (2) he cannot be held criminally liable for expressing his opinion about the causes of the voting machine breakdowns less forcefully than he initially intended. As discussed in part III, the crime of obstruction of justice does not require that the criminal plan or purpose succeed. While Shoup did not successfully obstruct justice because the United States Attorney became aware of his actions, he did endeavor to do so. And, because the crime of conspiracy is completed by the agreement and any act to further the common plan, Shoup could have successfully conspired to defraud the government and to obstruct justice prior to the time the United States Attorney became aware of his plans.

■ It is also alleged that the district court erroneously charged the jury by failing to define correctly the elements of a conspiracy to defraud the United States. He maintains that the charge should have stated that the prosecution was obligated to prove that he acted by deceit, craft, trickery, or dishonesty.[28] *See Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924). Because his attorney did not object to the charge at trial, in order to prevail on this point Shoup must now establish not only that the district court erred whatsoever, but also that it committed plain error. However, there is no error whatsoever in this portion of the charge. The language that Shoup cites has long ago been discarded by the courts. Sec-

**28.** The district court's instruction read as follows:

A conspiracy to defraud the United States includes not only a conspiracy which might involve the loss of Government funds of money, but also any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any agency or department of the United States government by a corrupt means or method.

When a person contracts verbally or in writing with the U. S. Attorney's Office to provide certain advice or assistance to it, in the course of its lawful duties and functions, that person becomes an agent for the United States, and such an agent takes on the duty and obligation of providing services honestly, faithfully and in a disinterested fashion; and in doing so without any bias or conflict of interest.

Any conspiracy that is calculated to deprive the Government or the United States of its right to the faithful, disinterested and unbiased judgment of its agents, or it [sic] is calculated to impair, obstruct or defeat the lawful function of any of its agencies or departments is a conspiracy to defraud the United States.

App. 1217–18.

tion 371 now reaches "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Dennis v. United States*, 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966). Thus, the district court did not incorrectly charge the jury on this point.

Shoup declares that the district court improperly charged the jury on entrapment by possibly leading the jurors to believe that he was contesting the indictment solely on the basis of entrapment.[29] Because his attorney did not object to this instruction at trial, once again Shoup must argue that the district court committed plain error in this regard.

■■■■■ A defendant is not entitled to an instruction on the defense of entrapment unless he admits that there were present the elements of the crime with which he is charged.[30] Because Shoup contested all elements of the crimes set forth in the indictment, he was not entitled to request an instruction on entrapment. The giving of an entrapment charge when one was not required can only have benefitted Shoup by permitting the jury to acquit him even if it found that he committed unlawful acts with the requisite mens rea. Shoup's contention that the charge nonetheless constituted plain error is not persuasive. The jury instructions are replete with references to the government's burden of proving every element of the crimes charged in the

indictment. The district court correctly and adequately instructed the jury that Shoup was contesting the indictment's allegations that the elements of § 371 and § 1503 were present. Consequently, reading the jury instructions as a whole,[31] it is clear that the trial judge did not err.

■■■■ The final argument is that the district court incorrectly permitted Dennis to testify that the government was harmed by Shoup's actions in that it was forced to hire a new expert to replace him. Shoup claims that Dennis' opinion of the reliability of the report was incompetent evidence to establish injury to the government. Because harm to the United States is not an element of § 371,[32] we conclude that any possible evidentiary error in this respect would have been harmless.

## V.

There was substantial evidence presented from which the jury reasonably could have concluded that Shoup conspired with Goldsmith for the twin purposes of defrauding the United States and of obstructing the lawful investigation of a federal grand jury, and that he endeavored to obstruct justice. Shoup's various contentions that the trial court committed reversible error also are without merit. There was testimony that Shoup deliberately, and in concert with his friend Goldsmith, set out to breach his promise to the United States that he

---

29. The district court instructed the jury as follows:

> You understand that by entering a plea of not guilty the defendant puts in issue each and every essential element of the crime or crimes charged, and then it becomes the obligation of the Government to prove guilty [sic] beyond a reasonable doubt as to every essential element.
> Now I mentioned to you that as to entrapment, I used the word as a defense. It is often spoken of as a defense because in the ordinary case it only arises where the facts are such that it is established beyond a reasonable doubt that all of the elements of the offense have been made out, but that the reason that it has occurred is by reason of inducement by a Government agency that has brought about the commission of the offense. And therefore, it's often spoke [sic]

of as a defense. But bear in mind that it's the obligation of the Government to prove beyond a reasonable doubt that there was no entrapment or that entrapment did not take place. And that is one of the essential elements of the Government's proof in this particular case.
App. 1236–37.

30. *United States v. Watson*, 489 F.2d 504, 507 (3d Cir. 1973). *See United States v. Levin*, 606 F.2d 47 (3d Cir. 1979) (per curiam) (affirming our holding in *Watson*).

31. *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

32. *See* notes 10 & 13 *supra*. *See also Haas v. Henkel*, 216 U.S. 462, 479, 30 S.Ct. 249, 54 L.Ed. 569 (1910).

would impartially investigate the causes of the widespread malfunctioning of voting machines in the November 1978 Philadelphia general election. He was entrusted with the responsibility of assessing whether the breakdowns in the machines actually represented an attempt by city officials to subvert the basic right of the Philadelphia citizenry to participate equally in the democratic process,[33] and he violated that trust. Conspiracy and other actions designed to mislead a federal investigation into alleged voting fraud cannot be countenanced. Accordingly, the judgment of conviction will be affirmed.

**33.** "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964) (Black, J.).