T.C. Memo. 1997-236


UNITED STATES TAX COURT


FOREST L. BUCKMASTER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5089-96.                          Filed May 21, 1997.


<u>Kevin G. Elmore</u>, for petitioner.[1]

<u>Eric D. Swenson</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


LARO, <u>Judge</u>:  Forest L. Buckmaster petitioned the Court on March 19, 1996, to redetermine respondent's determination of a $24,821 deficiency in his 1992 Federal income tax, a $1,111 addition thereto under section 6654(a), and a $4,964 accuracy-

---

[1] Petitioner filed his petition with the Court pro se. Kevin G. Elmore entered his appearance in this case on Dec. 24, 1996.

related penalty under section 6662(a) for substantial understatement of income tax. Respondent reflected these determinations in a notice of deficiency issued to petitioner on December 18, 1995.

Following respondent's concession of the addition to tax under section 6654(a), we must determine the following issues:

1. Whether petitioner's gross income includes his personal service income paid to a trust entitled Ideal Management.[2] We hold it does.

2. Whether petitioner is liable for the accuracy-related penalty determined by respondent. We hold he is.

3. Whether petitioner is liable for a penalty under section 6673(a)(1). We hold he is liable for a penalty of $5,000.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year in issue. Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded to the nearest dollar.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and exhibits submitted therewith are incorporated herein by this reference. Petitioner resided in San Diego, California, when he petitioned the Court. He filed a

---

[2] Although we use the word "trust" to refer to Ideal Management, we do not mean to suggest that Ideal Management is a trust for Federal income tax purposes. As discussed below, we conclude it is not. We use the word "trust" merely for convenience.

1992 Form 1040, U.S. Individual Income Tax Return, using the filing status of "Single".

Petitioner has worked installing floors since 1968. Before 1990, he worked as a sole proprietor; for 1989, his sole proprietorship reported gross receipts of $64,081 and net income of $29,236. During 1992, petitioner purportedly installed floors in his capacity as general manager of a trust entitled Ideal Management. Ideal Management's sole beneficiary was purportedly Clark Co. (Clark), a foreign trust based in Gibraltar in 1992, and in Belize City, Belize, C.A., in 1990 and 1991. Clark's sole beneficiary was purportedly Arlington Co. (Arlington), a third-tier trust with a trustee named Dennis Smith. The 1992 business address and phone number of Arlington, Clark, and Ideal Management were listed respectively as petitioner's home address and petitioner's home phone number. Clark did not file a Federal tax return, or pay Federal income tax, for any of the relevant years.

On or before April 3, 1989, petitioner paid $2,500 to the International Businessmen's Association (IBA) for documents to join Ideal Management. Ideal Management was purportedly formed by Cache Properties, Unlimited (Cache), with the transfer of $100 on January 12, 1989, and IBA's corepresentative at that time was Alex Yung. Mr. Yung, who also was Ideal Management's first trustee, was convicted of conspiring to defraud the United States by impeding, obstructing, and defeating the Internal Revenue

Service in the assessment and collection of Federal income taxes through the marketing through IBA of trusts similar to Ideal Management. His conviction was affirmed on appeal. See United States v. Scott, 37 F.3d 1564 (10th Cir. 1994).

On April 3, 1989, petitioner transferred his business property, including work tools and two vehicles, to Ideal Management in exchange for 100 capital units. Petitioner retained beneficial use of the transferred property after the transfer. On the same day, petitioner agreed with Ideal Management to provide his floor installation services as an independent contractor of Ideal Management in return for its paying him $300 per month. On December 28, 1990, petitioner and Ideal Management amended this agreement to provide that petitioner would receive $400 per month, and that petitioner could not be "terminated" without 30 days' written notice. Petitioner transferred his capital units to Clark on April 4, 1989.

Petitioner was Ideal Management's only floor installer during 1992, and his labor generated over $70,000 in revenue during that year. Petitioner worked full time for Ideal Management during that year at the rate of $400 per month, and Ideal Management paid him $4,600 in toto. Petitioner's 1992 Form 1040 reported $4,620 of gross income, consisting of the $4,600 from Ideal Management and $20 of interest income. The

contractor's license for the floor installation work completed by petitioner during 1992 was in petitioner's name only.

Petitioner and Sheila Webb (Webb), his friend and long-time roommate, lived in San Diego in 1992 at a house (the residence) which petitioner's father had transferred to them in 1984. Webb wrote Ideal Management monthly checks of $500 for petitioner's "rent" of the residence during that year, drawable on an account (the joint account) held jointly with petitioner, and the checks were deposited into an account of Ideal Management (the Ideal Management account) over which petitioner and Webb had signature authority. Ideal Management used petitioner's "rent", as well as the money received from petitioner's services, to pay the residence's property taxes, mortgage, and other expenses. Ideal Management also used these moneys to pay the expenses that petitioner purportedly incurred installing floors.

Ideal Management's 1992 tax return, Form 1041 (U.S. Fiduciary Income Tax Return), reported depreciation for the residence and assets that petitioner had originally transferred to Ideal Management.[3] Ideal Management's 1992 Form 1041 also claimed deductions (e.g., mortgage, insurance, repairs, utilities) totaling $17,788 for the residence and $40,503 of expenses (including $18,318 for the cost of goods sold) connected with petitioner's floor installation. Ideal Management's 1992

---

[3] Ideal Management began depreciating the residence in 1990, claiming a basis therein of $135,000.

Form 1041 claimed a $17,197 loss on its rental of the residence, which was used to offset the $24,123 of net income from petitioner's services. Ideal Management's 1992 "Total income" of $6,926 ($24,123 - $17,197) was reportedly distributed to Clark during that year.

Respondent analyzed the deposits made during 1992 into the joint account and the Ideal Management account. The deposits into the Ideal Management account aggregated $75,553, and the deposits into the joint account equaled $5,606. Based on her analysis, in the context of the surrounding facts, respondent determined that petitioner failed to report self-employment income of $73,021. Respondent also determined that petitioner was liable for self-employment tax of $8,961 on this unreported income. Respondent stated in the notice of deficiency that Ideal Management was a grantor trust or, alternatively, a sham.

On or about November 3, 1995, respondent filed a Federal tax lien against petitioner. The lien arose from petitioner's 1990 and 1991 taxable years. Respondent assessed petitioner's liability for these years on December 12, 1994, and July 3, 1995, respectively. Petitioner's liability for the assessed amounts aggregated almost $100,000 on the date of the lien.

## OPINION

We must decide whether the income earned by petitioner and paid to Ideal Management during 1992 was includable in petitioner's 1992 gross income. Respondent argues that it was,

contending primarily that Ideal Management was a sham. Petitioner argues that it was not. Petitioner, citing Portillo v. Commissioner, 932 F.2d 1128 (5th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1990-68, contends primarily that respondent's determination was a "naked assertion" because respondent did not audit Ideal Management. Petitioner also contends that Ideal Management was not a sham.

We agree with respondent that the disputed income is includable in petitioner's 1992 gross income because Ideal Management was a sham; i.e., it lacked economic reality. We find first that respondent's determination rests on a solid foundation. Respondent performed properly a bank deposit analysis of petitioner's and Ideal Management's bank accounts, see Parks v. Commissioner, 94 T.C. 654, 658 (1990); Nicholas v. Commissioner, 70 T.C. 1057, 1064 (1978); see also Estate of Mason v. Commissioner, 64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977); Harper v. Commissioner, 54 T.C. 1121, 1129 (1970), with the knowledge that petitioner was subject to an outstanding Federal tax lien aggregating almost $100,000, that he was connected with Ideal Management, and that his reported gross income and itemized deductions for 1992 had decreased dramatically from prior years. Respondent reached her determination in the light of United States v. Scott, 37 F.3d 1564 (10th Cir. 1994). In Scott, the Court of Appeals for the Tenth Circuit examined certain trusts involving IBA and Mr. Yung,

and found that these trusts were fraudulent.  Id. at 1572.  The Court of Appeals set forth an extensive analysis of these trusts, all of which were remarkably similar to Ideal Management. Suffice it to say that petitioner misread Portillo v. Commissioner, supra, if he truly believes that Portillo stands for the broad proposition that the determination at hand was "naked" because respondent did not actually audit Ideal Management.

We find that Ideal Management was merely a device conjured up for petitioner and other taxpayers seeking to avoid Federal income tax.  Petitioner testified that he was not tax motivated when he joined Ideal Management, and that he joined Ideal Management mainly to protect his assets from creditors. Petitioner testified that he transferred to Ideal Management his entire ownership interest in his assets so that his personal creditors would not be able to seize them if he was ever unable to pay a judgment or other liability.  Petitioner testified that he worked for Ideal Management in 1992 for $400 a month, when his services generated earnings of almost $6,000 a month.  Petitioner testified that he agreed initially to work for Ideal Management for $300 per month, performing basically the services he performed for almost 20 times that amount the year before. Petitioner asks the Court to believe his testimony and hold for him.  We decline to do so.  We find his testimony incredible. See Ruark v. Commissioner, 449 F.2d 311, 312 (9th Cir. 1971),

affg. per curiam T.C. Memo. 1969-48; Clark v. Commissioner, 266 F.2d 698, 708-709 (9th Cir. 1959), affg. in part and remanding in part T.C. Memo. 1957-129; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); see also Hawkins v. Commissioner, T.C. Memo. 1993-517, affd. without published opinion 66 F.3d 325 (6th Cir. 1995).

The Court of Appeals' opinion in United States v. Scott, supra, is most helpful to us in understanding the form, substance, and operation of Ideal Management. The opinion describes in detail how the trusts were marketed as a device for a purchaser to eliminate his or her income tax liability without losing control of his or her money and other assets. Like the trust at hand, the trusts in Scott were generally structured so that it would appear that the trust income was distributed to foreign trust beneficiaries, which then redistributed the income to other foreign trust beneficiaries that were outside the reach of the U.S. taxing arm. Id. at 1570. Other relevant characteristics of the trusts examined in United States v. Scott, supra, include that:

(1) The purchasers transferred their property, including houses, into trust;

(2) the trusts claimed depreciation deductions for the property;

(3) the trusts were reported to the Commissioner as simple trusts;

(4) Mr. Yung was a trustee;

(5)  foreign trusts in Belize acted as beneficiaries of the purchasers' trusts, and the foreign trusts owned the capital units;

(6)  the purchaser was never the named capital unit holder;

(7)  each trust was established by a fictitious domestic trust, named "Cache Properties", for a nominal amount of $100;

(8)  the second trust was usually a foreign trust with a trustee named Dennis Smith;

(9)  a purchaser could ensure perpetual control of his or her trust by naming himself or herself as secretary or manager;

(10)  a purchaser could not be removed or fired except with 30 days' notice; and

(11)  the trusts were "sold" by IBA for $2,500 apiece. Following our detailed review of the facts surrounding Ideal Management, with our knowledge of the facts in Scott, we reach the conclusion that Ideal Management was devised and operated similarly to the trusts examined in Scott.  We conclude that Ideal Management, like the trusts in Scott, was a sham.  Accord Hanson v. Commissioner, 696 F.2d 1232 (9th Cir. 1983), affg. T.C. Memo. 1981-675; Markosian v. Commissioner, 73 T.C. 1235 (1980); Dahlstrom v. Commissioner, T.C. Memo. 1991-265, affd. without published opinion 999 F.2d 1579 (5th Cir. 1993); Dahlstrom v. Commissioner, T.C. Memo. 1991-264, affd. without published opinion 999 F.2d 1579 (5th Cir. 1993).

Our conclusion is strengthened by our analysis of a number of factors that this Court has previously considered to help

ascertain whether a purported trust lacks economic substance for Federal income tax purposes.  These factors include:  (1) Whether the taxpayer's relationship, as grantor, to the property differed materially before and after the trust's formation; (2) whether the trust had an independent trustee; (3) whether an economic interest passed to other beneficiaries of the trust; and (4) whether the taxpayer felt bound by any restrictions imposed by the trust itself or the law of trusts. Zmuda v. Commissioner, 79 T.C. 714, 720-722 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); Markosian v. Commissioner, supra at 1243-1245; Hanson v. Commissioner, T.C. Memo. 1981-675.  Our analysis of each of these factors supports our conclusion.

With respect to the first factor, we look to the economic reality of a purported arrangement to determine who actually is the settlor of a trust, whether or not named as settlor in the related documents.  Zmuda v. Commissioner, supra at 720. Although the documents at hand list Cache as the settlor of Ideal Management, the fact of the matter is that Cache acted merely as a "straw man" to form Ideal Management.  See United States v. Scott, 37 F.3d at 1570.  We find that petitioner paid a $2,500 fee to transfer his assets to Ideal Management, and that Ideal Management's only assets during 1992 were petitioner's transferred assets including, possibly, the residence.  We find that petitioner used all of these properties as his own both before and after the transfer; i.e., he used his tools and vehicles to generate large revenues, and he and Webb lived in the

residence.  Although it is true that petitioner ostensibly made monthly "rent" payments to Ideal Management, Ideal Management applied these payments mainly to the residence's mortgage, property taxes, and other expenses.  Thus, we see clearly that petitioner stood in exactly the same spot with respect to his assets before and after their transfer to Ideal Management.  We find that the first factor points to a sham.

We find likewise with respect to the second factor; i.e., Ideal Management lacked a bona fide independent trustee.  Contrary to the assertions of petitioner and R. Richard Evans, the named trustee of Ideal Management during 1992, Mr. Evans could not prevent petitioner from using Ideal Management's property for his own purposes.[4]  Petitioner had signature authority over the Ideal Management account, which meant that he had access to the funds contained therein.  Petitioner also could not be removed from his position as Ideal Management's manager without 30 days' notice, which, in turn, gave petitioner perpetual control of Ideal Management.  See United States v. Scott, supra at 1571.  Petitioner's use of the residence and the tools of his trade also were free from restraint.

As to the third factor, we find no probative evidence in the record to indicate that petitioner transferred an economic interest to a third party when he transferred his assets to Ideal

_____

[4] Mr. Evans testified on behalf of petitioner.  We give his testimony little weight.  Among other things, we note that Mr. Evans was vague and evasive during his testimony.

Management. Petitioner asks the Court to find as a fact that he transferred his entire beneficial interest in Ideal Management to Clark for no consideration 1 day after he joined Ideal Management. We decline to do so. The facts of this case preclude such a finding. Ideal Management's minutes for an April 1989 meeting, for example, state that all 100 capital units would revert back to petitioner and Webb upon Clark's liquidation. Likewise, Clark's address during 1992 was petitioner's home address, which points to the conclusions that petitioner controlled Clark and that the purported transfer of the capital units to Clark did not actually give Clark any meaningful rights or interests in Ideal Management. We also believe it is implausible that petitioner would have transferred away all of his legal and beneficial interests in his assets, including the tools of his trade, for practically nothing in return. Following our review of the record, we are satisfied that petitioner was the actual beneficiary of Ideal Management. See United States v. Scott, supra at 1572.

As to the fourth factor, we find that petitioner was not bound by any restrictions imposed by Ideal Management or the law of trusts as to the use of the transferred property. Petitioner's unrestricted use of Ideal Management's property leads us to believe that it was not restricted in any meaningful manner, including fiduciary restraints.

We sustain respondent's determination on this issue.[5] Although petitioner asks us to allow him some deductions to offset this income, we decline to do so. Petitioner must prove his entitlement to any deduction, and he must keep sufficient records to substantiate any deduction that he claims. Sec. 6001; New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Petitioner has not introduced any evidence to substantiate his entitlement to any deductions, and the record does not persuade us that petitioner is entitled to any deductions.

Respondent also determined that petitioner was liable for an accuracy-related penalty under section 6662(a) because he substantially understated his Federal income tax. See sec. 6662(b)(2). As relevant herein, section 6662(a) imposes an accuracy-related penalty equal to 20 percent of an underpayment that is due to a substantial understatement of income tax. Petitioner will avoid this penalty if the record shows that his income tax was not understated by the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). The accuracy-related penalty of section 6662 is not applicable to any portion of an underpayment to the extent that an individual has reasonable cause for that portion and acts in good faith with respect thereto. Sec. 6664(c)(1). Such a determination is made by taking into account all facts and

---

[5] Petitioner has not challenged respondent's determination that this income is subject to self-employment tax. We sustain that determination without further comment. See Rule 142.

circumstances, including the experience and knowledge of the taxpayer and his or her reliance on a professional tax adviser. Sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioner argues that he is not liable for this penalty because he did not understate his Federal income tax for 1992. This is so, petitioner contends, because Ideal Management was not a sham. We have already held that Ideal Management was a sham. Nor do we find that petitioner had reasonable cause for his understatement. We sustain respondent's determination on this issue.

Turning to the final matter, respondent moved the Court at the end of trial to impose a penalty under section 6673(a)(1). Respondent asserts that petitioner's position is frivolous and groundless, and that petitioner instituted this lawsuit primarily for delay. In relevant part, section 6673(a)(1) provides:

SEC. 6673(a). Tax Court Proceedings.--

(1) Procedures instituted primarily for delay, etc.--Whenever it appears to the Tax Court that--

(A) proceedings before it have been instituted or maintained by the taxpayer primarily for delay,

(B) the taxpayer's position in such proceeding is frivolous or groundless, or

*    *    *    *    *    *    *

the Tax Court, in its decision, may require the taxpayer to pay to the United States a penalty not in excess of $25,000.

We agree with respondent that petitioner is liable for a penalty under section 6673(a)(1), and we require him to pay a penalty to the United States in the amount of $5,000. Petitioner's conduct throughout this proceeding has convinced us that he instituted and maintained this proceeding primarily for delay. His position in this proceeding also is groundless and frivolous. See <u>Coleman v. Commissioner</u>, 791 F.2d 68, 71 (7th Cir. 1986); see also <u>Neitzke v. Williams</u>, 490 U.S. 319 (1989) (defining legal frivolousness). Petitioner's insistence on pursuing his fruitless arguments has consumed time and effort of this Court (and of respondent) that could have otherwise been devoted to resolving bona fide claims of other taxpayers. See <u>Cook v. Spillman</u>, 806 F.2d 948 (9th Cir. 1986).

We have considered all arguments made by petitioner in this proceeding and, to the extent not discussed above, find them to be irrelevant or without merit. To reflect the foregoing,

<u>An appropriate order and decision will be entered for respondent except for the addition to tax under section 6654</u>.